UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA       CRIMINAL NO. 15-CR-00234-01/02

VERSUS       JUDGE FOOTE

DAVID DIAZ, JR.  and       MAGISTRATE JUDGE HORNSBY
EZEQUIEL LANDAVERDE-CASTILLO

## REPORT AND RECOMMENDATION

**Introduction**

     Defendants David Diaz, Jr. ("Diaz") and Ezequiel Landaverde-Castillo ("Castillo")
are charged with conspiracy to possess and possession with intent to distribute over one
kilogram of heroin.  The drugs were found during a routine traffic stop on Interstate 20 ("I-
20") in Bossier Parish, Louisiana.

     Before the court are Defendants' **Motions to Suppress**.  **Docs. 48 and 51**.
Defendants argue that the traffic stop and search were illegal, and that all drugs, statements,
and other evidence discovered should be suppressed.  For the reasons that follow, it is
recommended that Defendants' motions be **denied**.

**Factual Background**

     The evidentiary hearing and the dash camera recording established the following facts.
On November 12, 2015, at approximately 1:30 a.m., Louisiana State Trooper George
Strickland ("Strickland") was parked in his marked SUV on the eastbound shoulder of I-20
near mile marker 25 in Bossier Parish, Louisiana.  Tr. 10. His headlights and tail lights were

on, but his emergency lights were off.  Strickland saw a car in his driver's side mirror approaching from the west and driving in the left inside (passing) lane.  After the car passed Strickland, the car continued in the left lane with no other traffic in the vicinity.  Tr. 11. Strickland pulled on to I-20 east to further observe the vehicle, which he found was going 65 in a 70 mile-per-hour zone while traveling in the passing lane. Tr. 34-35.   Strickland quickly ran the car's license plate on his computer to verify the car was not stolen, then he turned on his emergency lights to make a traffic stop for improperly driving in the left lane. La. R.S. 32:71.

Strickland exited his patrol car, and saw there were two people in the front seats. Strickland approached the car and asked the driver, Defendant Diaz, to step to the rear of the vehicle.  Tr. 13. Strickland explained the reason for stopping him, and Diaz stated, "Oh, my bad." Id.  Diaz provided a Georgia license, and then Strickland asked if they were heading to Georgia, to which Diaz replied, "yeah."   Id.  Strickland asked Diaz where they were driving from, and Diaz answered, "Huh, actually um, Houston," then laughed nervously. Id. Strickland also noticed Diaz paused frequently before answering basic questions, looked down, and broke eye contact often.

Strickland asked Diaz who his passenger was, and Diaz responded it was his friend. Diaz also said the car belonged to his friend.  The passenger was later identified as Defendant Castillo.  Diaz told Strickland he (Diaz) rode to Houston with some friends, but he was going back to Georgia for work.  When Strickland asked Diaz how long he had been in Houston,

Diaz stated "Like, probably a day."  Tr. 14. Strickland found it odd Diaz went from Georgia to Houston for only a day.

Strickland asked Diaz what his friend's name was, and Diaz hesitated, looked back at the car, and said "Um, Jose."  Tr. 14. Strickland also found it odd Diaz had to think about his friend's name.  Strickland asked Diaz to stand in front of his patrol unit while he talked to Castillo.

Strickland went to the passenger side of the car and asked the passenger for identification.  Castillo provided a limited term Texas driver's license with a Houston address.

Strickland asked Castillo if the vehicle was his, and Castillo replied, "Yeah." Strickland asked him where they were traveling from, and Castillo said Houston.   Tr. 14. Strickland noticed Castillo kept looking around the car and would not make eye contact with him.  Castillo spoke only broken English, but he appeared to understand Strickland, and he answered the questions.

Castillo told Strickland he was going to Atlanta to work in construction.  Tr. 14. Strickland noticed one small red suitcase and one Styrofoam ice chest on the back seat, but he did not see anything related to construction inside the car.  Tr. 15. Of course, Strickland did not know at this point what tools or luggage might be in the trunk of the car.

Strickland asked how Castillo knew Diaz, to which he replied, "That's my amigo." Tr. 15.  Strickland asked Castillo if he knew why Diaz went to Houston, and Castillo replied that Diaz was visiting his parents.  Strickland asked how long Diaz had been in Houston, and

Castillo replied two or three days.  Tr. 15. Strickland instructed Diaz to get back in the car and started walking back to his own unit.

Suspecting criminal activity was afoot, Strickland immediately requested backup, and Trooper Brent Peart ("Peart") quickly arrived.  Tr. 18-19, 69.  Strickland then performed a license and warrants check, which showed Diaz had a recent narcotics conviction in Georgia and other narcotics arrests.  Tr. 19. Strickland noted the vehicle was registered to Castillo on November 9, 2015, just a few days earlier.  Strickland also knew that Houston, Texas is a major source of narcotics and human trafficking from Mexico, and I-20 is a drug smuggling corridor.  Tr. 13.

 Strickland asked Castillo for consent to search his car, and Castillo immediately agreed and started to open the trunk. Tr. 20.  Strickland told Castillo to wait, and he handed him the Spanish version of the State Police Consent to Search Form.  Strickland told Castillo to read over the form and make sure he understood the form before signing at the bottom. Strickland held his flashlight for Castillo to help him see while he read the form on the trunk of Castillo's car.  After Castillo signed the form, Strickland returned Castillo's driver's license to him and asked him to stand with Trooper Peart.  Strickland then asked Diaz to step out of the vehicle, frisked him, returned his driver's license, and asked him to stand with Peart and Castillo. Tr. 21-22.  Peart spoke to both Defendants in English while Strickland began the search.  Tr. 71.

Strickland found a book titled *La Biblia de la Santa Muerte* in a duffel bag on the

back seat, which he knew from experience and training was common with drug traffickers.[1] Tr. 22. Peart then assisted with the search, while Defendants stood beside Strickland's vehicle.  The troopers found a ratchet in the cup holder between the front seats with a hex bit and standard socket.  Tr. 23. Strickland noticed fresh tool marks on the bolts securing the front seats and discovered that the ratchet fit those bolts.  The troopers also noticed a very strong chemical smell within the car, and they could see and feel fresh paint and some type of silicone had been applied under the seats. Tr. 23.

The troopers believed, based on all of their observations, that there was a false compartment under the front seats.   They asked Diaz and Castillo to follow them to Troop G, where they removed the seats using the tools from the cup holder.  Tr. 25, 72.  Under the seats were false compartments containing 18 packages of a substance that tested positive for heroin.  The total weight of the packages was approximately 15 pounds.  Tr. 27-29, 81.

Both defendants were placed under arrest and were interviewed after Miranda warnings and waivers. Tr. 72, 82. Diaz stated he flew from Georgia to Houston, as instructed by a person he knows only as "Shark."  He said "Shark" purchased his plane ticket, and he told Diaz to pick up a car in Houston and bring it back to Georgia.  "Shark" gave Diaz a number to call when he got to Houston.  Shortly after that call was made, Castillo, who he did not know, picked him up from the airport.  Tr. 84.

---

[1] Castillo was also wearing a necklace with the Santa Muerte figurine when he was arrested.  See United States v. Guerrero, 768 F.3d 351, 356 (5th Cir. 2014) (Government expert testified in a trial of a Mexican Mafia member that Santa Muerte was a religious figure that many drug traffickers along the United States–Mexico border keep close by because they believe she offers spiritual protection.)

Diaz and Castillo went to a Wal-Mart, a bar, and then to the house where the subject car was already parked.   Tr. 85. Defendants entered the house, where Castillo packed a bag and told Diaz he was riding back with him to Atlanta.  Diaz also said that when Strickland pulled them over, Castillo told him to "chill" and tell the trooper they were going from Houston to Atlanta for work.  Tr. 85-86.  During the interview, Diaz expressed surprise that heroin was in the car, as he knew "Shark" to deal in meth.  Tr. 99.

Castillo also gave a statement, after agents gave him a written Statement of Rights form in his native Spanish, which he signed.  Tr. 87, 95-97.  Castillo said he was taking Diaz back to Atlanta because his car broke down, and Diaz need to get back to Atlanta for work.  Tr. 98. Castillo admitted he owned the car.  Like Diaz, he denied any knowledge of the heroin. Tr. 90, 100-101.

## Law and Analysis

### Standing

Both Defendants have standing to  challenge the constitutionality of the traffic stop. United States v. Martinez Alvarez, No.  2012 WL 4863212, at *2 (M.D. La. Oct. 12, 2012). But the Government argues that Diaz, who never claimed any ownership or other interest in the car owned by Castillo, lacks standing to complain about the search of the vehicle.

The Government is correct.  The Fifth Circuit has recognized that "passengers who assert[ ] neither a property nor a possessory interest in the automobile that was searched, nor any interest in the seized property, ha[ve] no legitimate expectation of privacy entitling them to the protection of the [F]ourth [A]mendment."  Iraheta, 764 F.3d 455, 461 (5th Cir. 2014);

United States v. Greer, 939 F.2d 1076, 1093 (5th Cir.1991).  The Fifth Circuit has declined to adopt a different rule applicable to a driver simply because he happens to be behind the wheel when the car is stopped.  United States v. Riazco, 91 F.3d 752, 754 (5th Cir. 1996). Diaz never responded to the Government's standing argument, even after he was given an opportunity to file a post-hearing supplemental brief.

The court need not, however, decide Diaz's motion solely on the basis of standing. As shown below, neither the traffic stop nor the subsequent search of Castillo's car violated the constitution.

### The Traffic Stop

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 2014 WL 6065297, at *4-5 (5th Cir. 2014); United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id.

For a traffic stop to be justified at its inception, an officer need only have reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir.2005). "Reasonable suspicion" analysis requires assessing the totality of the circumstances to ascertain the reasonableness of the suspicion.  United States v. Powell, 732

F.3d 361, 369 (5th Cir.2013) (citation omitted). This is consistent with the "touchstone of Fourth Amendment analysis [being] reasonableness", which "requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004) (en banc).

The Supreme Court held unanimously in Whren v. United States, 517 U.S. 806 (1996): "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. at 810. "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." United States v. Zavala, 541 F.3d 562, 575 (5th Cir.2008) (quoting United States v. Castro, 166 F.3d 728, 733 (5th Cir.1999) (en banc)). Therefore, probable cause to make a traffic stop exists, inter alia, when a defendant commits a traffic violation and a law-enforcement officer observes the violation. United States v. Khanalizadeh, 493 F.3d 479, 482 (5th Cir. 2007).

"The rule established by the Supreme Court in Whren allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop", United States v. Cole, 444 F.3d 688, 689 (5th Cir. 2006). The legal justification for the traffic stop must simply be "objectively grounded." Id.

Terry's first prong is easily met in this case. Trooper Strickland had probable cause to believe that Defendant's car was traveling in the passing lane of the interstate in violation of La. R.S. 32:71.  He saw the car in his rear view mirror approach his location in the

passing lane, gave the driver more than enough time to get back in the right lane (once the driver passed Strickland's vehicle), and when the driver remained in the passing lane, he pulled out onto the interstate to follow the car.  When it still did not move to the right lane as the law required, he initiated the traffic stop.

Defendant Castillo presented the testimony of Major Fant, a former law enforcement officer, as an expert regarding whether the traffic stop was properly made.  The court allowed the testimony, subject to the Government's objection.  The evidence ultimately showed that Major Fant had no personal experience in making traffic stops for traveling in the passing lane, nor was he qualified by any other means to offer his opinions.  While Major Fant may well qualify as an expert on other matters involving law enforcement, that was not the case here.  The court rejects Major Fant's testimony and opinions in toto.

Defendants insinuate that Strickland's testimony about his reason for the stop is not credible.  While they never come out and say it directly, they surmise that Strickland had some kind of tip or advance notice that drugs were hidden inside the car.  The court conducted an *in camera* review of dispatch logs and related information, none of which contradicted Strickland's testimony or provided support for such a theory.

It is true that Strickland and his partners (Troopers Peart, Cason, and others) are highly successful in finding illegal drugs and other contraband following routine traffic stops on I-20.  Their past successes may have led to Defendants' suspicions of a tip.  But it is not rocket science to suspect that, when two men who are driving from Houston, Texas to Atlanta, Georgia in a car purchased just days before, after spending only a day in Houston,

Page 9 of  14

behave nervously and never or rarely make eye contact, claim to be friends but do not know each other's name, give conflicting stories about their itinerary, and one has a criminal history for illegal drug activity, criminal activity is probably afoot.  It was reasonable to request consent to search the car under such circumstances.

Defendants also argue (and Castillo testified) that Strickland's patrol car straddled the middle of the roadway—thereby blocking Diaz from moving into the right lane—as Strickland quickly approached from behind.  Strickland's testimony, which is supported by the first few seconds of the dash camera recording, was more credible on this point.  He did not block Defendants' car from moving over into the right lane.  Instead, Strickland moved his car toward the middle of the road (rather than positioning himself directly behind Defendants' car in the left lane) so that Diaz would know to move to the right lane and then to the right shoulder rather than attempting to stop in the median on the left side of the highway.

As to <u>Terry</u>'s second prong, whether the officer's actions were reasonably related in scope to the circumstances that justified the stop, an officer's actions are not reasonably related if the officer detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless the officer develops reasonable suspicion of additional criminal activity in the meantime. <u>Brigham</u> 382 F.3d at 506.   If the officer develops reasonable suspicion of additional criminal activity during the investigation of the circumstances that originally caused the stop, the officer may further detain the occupants

for a reasonable time while appropriately attempting to dispel this reasonable suspicion. Id.; United States v. Aguilera, 2014 WL 7404535, at *3 (N.D. Tex.).

The Fifth Circuit has held that an officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop.  United States v. Pack, 612 F.3d 341, 349-350 (5th Cir. 2010). The officer may also ask about the purpose and itinerary of the occupants' trip as part of this investigation, because these questions are considered to be reasonably related in scope to the investigation of the circumstances that caused the stop. Id. Additionally, an officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop. Id. The reasoning behind this rule is that the Fourth Amendment protects against detention, not questioning. Id. Thus, no Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed. Id.

Trooper Strickland acted promptly and professionally in investigating the reasonable suspicion of criminal activity that arose during the traffic stop.  As soon as Strickland made contact with Diaz (the driver), Strickland noticed that Diaz was visibly nervous and would not make eye contact when answering basic questions.  Diaz claimed he traveled from Georgia to Texas for only a day.  He did not know the name of his friend, the passenger, who owned the car.  When Strickland approached Castillo, he looked around the car nervously

and would not make eye contact. His description of the travel plans differed significantly from that given by Diaz.

Strickland ran Defendants' names through the system and learned that Diaz had a criminal history for illegal drugs. He then decided to seek consent to search the car. He sent an instant message to Trooper Cason, who was close by and arrived very quickly. Strickland then requested consent to search from Castillo, the owner of the car, which was readily granted, both orally and in writing. Considering the circumstances, Trooper Strickland acted appropriately in investigating the reasonable suspicion of illegal activity that arose during the routine traffic stop.

### Consent to Search

In determining whether a consent to search is voluntary, the Fifth Circuit reviews several factors, no one of which is dispositive. These factors include: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of her right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. United States v. Jenkins, 46 F.3d 447, 451 (5th Cir. 1995).

Castillo was not in custody. Strickland acted professionally and did not use any coercive tactics. Castillo was cooperative. He read the consent form in his native language before signing the form, and he appeared to understand it. That form advised Castillo of his right to refuse consent. It is likely that Castillo believed the heroin was so well hidden in the

compartments beneath the seats that it would not be discovered.  Therefore, Castillo's consent to search the car, which he gave readily to Trooper Strickland orally and in writing, was freely and voluntarily given.

### Defendants' Statements

Defendants also challenge their post-arrest statements. The evidence at the hearing shows that Defendants' statements were made freely and voluntarily.  Both received and signed <u>Miranda</u> warnings and freely spoke to DEA agents.  There was no duress or coercion. Both Defendants were cooperative.

### Conclusion

The traffic stop was based on reasonable suspicion that Diaz commited a traffic violation for improperly driving in the left or passing lane of the highway.  Based on the reasonable suspicion that developed during the stop, Trooper Strickland was well within the Fourth Amendment to inquire further and ask for consent to search.  All of these events happened within a few minutes, with no unwarranted delays.

There were no Fourth of Fifth Amendment violations in this case.  All of the evidence located in the Castillo's car, as well as Defendants' statements to the agents, should be admitted.

Accordingly;

**IT IS RECOMMENDED** that Defendants' Motions to Suppress (Docs. 48 & 51) be denied.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b).  A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 21st day of July, 2016.

Mark L. Hornsby
U.S. Magistrate Judge

Page 14 of  14